**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

FILED 10 PM 0:28

U.S. DISTRICT COURT
N.B. OF ALABAMA

DAVIDA DIONNE DAVIDSON,                    )
                                            )
      **Plaintiff,**                         )
                                            )
v.                                          )     **CIVIL ACTION NO.**
                                            )
**AMSOUTH BANK,**                           )     **CV-99-B-1709-S**
                                            )
      **Defendant.**                         )

**ENTERED**

DEC 1 3 2000

## MEMORANDUM OPINION

Currently before the court is Defendant AmSouth Bank's Motion for Summary Judgment. Plaintiff Davida Dionne Davidson ("plaintiff" or "Davidson") filed this lawsuit against AmSouth Bank ("AmSouth" or "defendant") alleging that defendant discharged her on the basis of race and sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*., as amended by the Civil Rights Act of 1991, 1981A, and 42 U.S.C. § 1981. Plaintiff also claims that she was subjected to disadvantageous terms and conditions of employment as compared to white male employees. In addition, plaintiff alleges that defendant discharged her in retaliation for complaining about sex discrimination. Upon consideration of the record, the submissions of the parties, the argument of counsel, and the relevant law, the court is of the opinion that defendant's Motion is due to be granted.

37

## I.   FACTUAL SUMMARY

Plaintiff was initially hired by AmSouth as a Wholesale Lock Box Clerk in July of 1996.[1]
(*See* Deposition of Davida Dionne Davidson ("Davidson Dep.") at 54, 66; Affidavit of Davida
Dionne Davidson ("Davidson Aff.") at ¶ 2.)  Next, plaintiff performed the job of Lead Balance
Clerk, and at times, plaintiff served as Acting Supervisor of the Balance Clerks.  (*See* Davidson
Dep. at 67, 74.)

In approximately January of 1998, plaintiff transferred from her job as a Balance Clerk to
a job as a Blocker.  (*See* Davidson Dep. at 90; Davidson Aff. at ¶ 2.)  While working as a
Blocker, plaintiff's supervisors were Kenneth Maddox ("Maddox"), Nick Giambrone
("Giambrone"), and Lisa Barker ("Barker").  (*See* Davidson Dep. at 85.)  Maddox was plaintiff's
immediate supervisor, and Giambrone was Maddox's supervisor.  (*See id*.)

In approximately June of 1998, when Maddox was on his honeymoon, Barker was
plaintiff's Acting Supervisor.[2]  (Davidson Dep. at 118; Barker Dep. at 30.)  During that time,
while plaintiff was performing her job as Blocker, plaintiff claims that Barker grabbed a piece of
paper from her hand.  (*See* Davidson Dep. at 118-121.)  Plaintiff contends that she then took the
piece of paper back from Barker.  (*See id*.)  The next morning, Barker confronted plaintiff about

---

[1] Plaintiff was previously employed with AmSouth in the late 1980s.  (Davidson Aff. at
¶ 2.)  However, that first term of employment has no bearing on plaintiff's claims.

[2] Both Maddox and Barker testified that while Maddox was on his honeymoon, Larry
Clayton ("Clayton"), a white male served as Acting Supervisor to the Lead Balance Clerks.  (*See*
Deposition of Kenneth Maddox ("Maddox Dep.") at 34; Deposition of Lisa Barker ("Barker
Dep.") at 30.)

the "paper snatching" incident in the presence of Clayton, the Sorter Room Supervisor. (*See id.* at 118-19.) Barker told Clayton that plaintiff snatched the paper from her while trying to get the paper back. (*See id.* at 118.) During this conversation, plaintiff told Barker and Clayton that because Maddox was not present, she did not have to talk to them, and that she would talk to someone above them. (*See id.* at 118-19.) Plaintiff contends that Barker then said it did not matter who plaintiff talked to, "because we're all going to stick together." (*See id.* at 119.)

On the Monday after this incident, plaintiff called Fred Rogan ("Rogan") at AmSouth Corporate Human Resources Department, and set up a meeting for the following day. (*See* Davidson Dep. at 121-125.) When plaintiff met with Rogan, he was the Corporate Manager for Employee Relations. (*See* Deposition of Charles Frederick Rogan ("Rogan Dep.") at 7.) During their meeting, plaintiff informed Rogan about the "paper snatching" incident and about a rumor that plaintiff was having sexual relations with the night janitorial staff. (*See* Davidson Dep. at 100, 121-25.) Rogan asked plaintiff if she thought the incident occurred because plaintiff is black, and plaintiff responded that she did not know. (*See id.* at 123.) At the conclusion of the meeting, Rogan told plaintiff that he was going to talk to Giambrone, and that plaintiff should call him back in two weeks. (*See id.* at 124-25.) Plaintiff stated, however, that she did not call Rogan back until just before she filed a charge with the EEOC in December of 1998. (*See* Davidson Dep. at 125-27.) This was approximately six months after AmSouth terminated plaintiff.

On July 2, 1998, plaintiff was terminated from her employment with AmSouth for violating AmSouth's Call-in policy. (Affidavit of Rená Ramsey ("Ramsey Aff.") Ex. E.) This policy provides:

3

> Employees who are absent or absent a partial day and do not call
> the appropriate supervisor within one (1) hour of starting time will
> be charged with one (1) additional occurrence of absence for that
> occasion, unless within twenty-four (24) hours of returning to
> work the employee provides a medical excuse which shows that
> the employee was medically incapacitated and that it was not
> possible to notify the Company.  Any employee who does not call
> in or report to work for three (3) consecutive days will be
> terminated, unless he/she can show that he/she was medically
> incapacitated and unable to call.

(*See* Ex. 8 to Davidson Dep.) (emphasis in original.)  Plaintiff acknowledges that she read and

understood this policy. (*See* Davidson Dep. at 152-53.)

The events which led to plaintiff's termination occurred between Monday, June 22, 1998,

and Thursday, July 2, 1998.  Plaintiff was scheduled to work on Monday, June 22, 1998.[3]  (*See*

*id*. at 155-56.)  Plaintiff stated that before her Monday shift, she called Giambrone and informed

him that she would not be in at midnight due to illness. (*See id.* at 158.)  Giambrone then told

plaintiff that she should call Maddox the next morning. (*See id.* at 159-60.)  Plaintiff called

Maddox on Tuesday, June 23, 1998, and told him that she was sick to her stomach. (*See id.* at

159.)  On June 23, 1998, at 10:59 p.m., Maddox sent the following e-mail to his supervisor,

Giambrone, regarding plaintiff's absence:

> Just got through talking with Ms. Davidson . . . . . I asked her what
> it was that she was out for and she responded that she "couldn't
> quite place it" and that she was "going through a lot of things right
> now."  She said that she did not call me Tuesday morning because
> she was still asleep . . . . . I didn't ask, but she told me that I didn't
> need to worry because she had a doctor's excuse. Needless to say,

---

[3] For clarity, plaintiff worked the twelve midnight to eight a.m. shift. (*See* Davidson
Dep. at 156.)  Therefore, when this Memorandum Opinion states that plaintiff was scheduled to
work Monday, it means that plaintiff was scheduled to work from midnight Monday to eight
a.m. Tuesday morning. Each time this opinion refers to plaintiff's workday, it will refer to
plaintiff's workday by stating the day only. For example, the Tuesday shift would denote
midnight Tuesday to eight a.m. Wednesday morning.

> it sounded very weak at best.  Do you have any ideas other than
> just waiting on her to come back in?

(*See* Deposition of Nick Giambrone ("Giambrone Dep.") at Ex. 2.)  On Wednesday morning,

June 24, 1998, before the shift ended, plaintiff called Maddox again and told him that she had

the chicken pox.  (*See* Davidson Dep. at 159-61.)  Plaintiff contends that after telling Maddox

this, he laughed and stated that he had never had the chicken pox, and that she should stay out a

week.  (*See id*. at 161.)[4]  Plaintiff admits, however, that Maddox did not relieve her of the

obligation to call in.  (*See id*. at 161-162.)  Other than her conversation with Maddox, plaintiff

did not call in Wednesday, and missed her shift that evening.  (*See id*. at 162.)

At approximately 4:00 a.m. on Thursday morning, during plaintiff's Wednesday shift,

Maddox sent an e-mail to Renà Ramsey ("Ramsey"), an African American female in AmSouth's

corporate Human Resources Department.  (Giambrone Dep. Ex. 3; *see also* Rogan Dep. at 11.)

The e-mail asked for guidance and a suggested course of action for dealing with plaintiff's

absences.  (*See* Giambrone Dep. Ex. 3; Ramsey Aff. at ¶ 2.)  Later that day, Ramsey replied with

the following e-mail:

> First of all, charge her the appropriate number of occurrences for
> her absences (including an extra occurrence for each time she
> called in late or did not call in.)  Because her absences have been
> consecutive, she would only have one occurrence due to actual
> absence.  It does not appear that she has abandoned her job, but I
> would advise you not to contact her again until she contacts you.
> If she doesn't contact you within three days of her last contact with
> you, then she would be terminated for job abandonment.  It is more
> likely that she will eventually call and return to work.  At that
> time, you can require a doctor's excuse.  I think you should also
> give her a written warning which outlines the appropriate
> procedure for calling in and reporting the intent to be absent or

---

[4]  Maddox acknowledges that he had a conversation with plaintiff about the chicken pox,
but denies that he told her to stay out for a week.  (*See* Maddox Dep. at 27.)

> tardy. Within the warning memo you should document what she
> did, why it was wrong, and the appropriate way to report future
> absences.

(*See* Giambrone Dep. Ex. 4; *see also* Ramsey Aff. at ¶ 2.) Plaintiff again missed work on

Thursday, June 25, 1998, and Friday, June 26, 1998, without informing Maddox that she would

be absent. (*See* Davidson Dep. at 162-63.) Plaintiff was scheduled to be off of work on

Saturday, June 27, 1998, and Sunday, June 28, 1998. (*See id*. at 163.) On Saturday, June 27,

1998, Maddox sent another e-mail to Ramsey stating that plaintiff missed her Wednesday (June

24, 1998), Thursday (June 25, 1998), and Friday (June 26, 1998) shifts without calling in. (*See*

Giambrone Dep. Ex. 5; Ramsey Aff. at  ¶ 3.)

On Monday, June 29, 1998, Ramsey responded to Maddox's e-mail, stating that

plaintiff's absences and failure to call constituted job abandonment and that plaintiff should be

terminated unless she had a "very valid excuse." (*See* Giambrone Dep. Ex. 6; Ramsey Aff. at ¶ 3

and Ex. D.) Plaintiff admits that she did not call in before her shifts on Monday (June 29, 1998),

Tuesday (June 30, 1998), or Wednesday (July 1, 1998), because she was sick.[5] (*See* Davidson

Dep. at 163, 166.) On Thursday, July 2, 1998, plaintiff went to the hospital emergency room

and, once there, called work. (*See id.* at 165.) Thinking that she was supposed to work that

night, plaintiff talked to Maddox and told him that she was not going to be in for her shift that

evening. (*See id*. at 167.) During this conversation, Maddox told plaintiff that she had been

terminated. (*See id*.) Plaintiff did not ask Maddox why she had been terminated, and she did not

tell her mother, who was at the hospital with her. (*See id*. at 167-68.) Also on July 2, 1998,

Giambrone sent plaintiff a letter informing her that she had been terminated for abandoning her

---

[5] Plaintiff was not informed of her termination until July 2, 1998; therefore, under
AmSouth's call in policy, plaintiff should have been calling in on these days.

job, and that if she had any questions regarding her termination to contact Renà Ramsey. (*See* Davidson Dep. at 153; Ramsey Aff. at ¶ 4 and Ex. 4.) Plaintiff has never contacted Ramsey about her termination. (*See* Ramsey Aff. at ¶ 4.)

Plaintiff stayed at the hospital one night, and received a prescription for her illness.[6] (Davidson Dep. at 169.) She admits that no doctor ever told her that she had the chicken pox, but that she thought she had the chicken pox because her sister had it a couple weeks of before. (*See id.* at 170.) Plaintiff never provided AmSouth with a doctor's excuse for any of her absences, which began on June 22, 1998. (*See* Ramsey Aff. at ¶¶ 4-6.)

Plaintiff claims that although she did not call in for three straight days, other people in the department failed to call in and were not terminated. (*See* Davidson Dep. at 179-80.) Plaintiff identified a person named Matt Ingle ("Ingle"), a white male, who worked in the Sorter room. (*See id.*) Plaintiff alleges that when Ingle hurt his arm, he failed to call in for three straight days and that he was not terminated. (*See id.*) However, when plaintiff was asked at her deposition whether she knew whether he called in to a supervisor, plaintiff's responded, "I think Kenneth mentioned that he didn't call in." (*See id.* at 180.) Further, Ingle's attendance record contains no notations that Ingle ever failed to report his absences. (Ramsey Aff. at ¶ 7 and Ex. F and G.)

Plaintiff also contends that Barker, a white female, was ill for three days and was not fired. (*See* Davidson Dep. at 181.) However, plaintiff testified that she did not know whether Barker called in or not. (*See id.*) In her deposition testimony, Barker acknowledged that she was absent for three straight days, but stated that she did call in daily because "[t]hat's policy." (*See*

---

[6] Plaintiff could not remember the doctor's diagnosis. (*See* Davidson Dep. at 169.)

7

Barker Dep. at 35.)  Maddox, Barker's supervisor, also testified that Barker called in to report her absences.  (*See* Maddox Dep. at 32.)

On December 18, 1998, plaintiff filed an EEOC Charge claiming that AmSouth discriminated against her on the basis of race and sex.  (*See* Davidson Dep. Ex. 5.)  Plaintiff did not allege retaliation in her EEOC Charge.  (*See id.*)  On July 1, 1999, plaintiff filed a complaint in this court alleging that she was subjected to disparate terms and conditions of employment because of race and sex, that her termination was discriminatory on the basis of race and sex, and that her termination was in retaliation for complaining about sex discrimination.  In addition to complaining about her termination, plaintiff alleges that a number of incidents (discussed below) were discriminatory.

Plaintiff claims that a white male co-worker named "Andre" once asked her what she thought of the Ku Klux Klan.  (*See* Davidson Dep. at 87.)  Plaintiff contends that she was offended by the question, and responded to Andre that she believed the Ku Klux Klan had a right to assemble, but that they better not come to her yard.  (*See id.* at 87-88.)  Plaintiff did not, however, complain to anyone about the incident, and she stated that she thought it was just Andre's way of telling her that he was a Ku Klux Klan person.  (*See id.* at 88.)

Plaintiff complains that on another occasion, when her department ordered food from the Purple Onion, her food was given to her "soaking wet."  (*See* Davidson Dep. at 126.)  When plaintiff asked Barker why her food was wet, Barker replied that she thought it may have been because of the steam.  (*See id.*)  Plaintiff stated that she threw her food away because she "didn't know if it was spit or saliva."  (*See id.*)

Plaintiff also complains that at one time there was a rumor that she was involved in a sexual relationship with two men from the night janitorial staff.  (*See* Davidson Dep. at 93-100.)

8

She stated that one of these men from the night staff informed her of the rumor, and that she responded to him by saying that she did not care about the rumor because it was not true. (*See id*. at 93-94.) Plaintiff also stated that she overheard Barker talking about the rumor during a telephone conversation. (*See id*. at 95-98.) The only other conversation plaintiff claimed to overhear concerning the rumor occurred while she was at Wal-Mart with her sister and niece. (*See id.* at 98-99.) Plaintiff contends that while she was shopping at Wal-Mart, three AmSouth employees from Wholesale[7] passed by her and said "that's the girl right there [who] was in a threesome." (*See id*. at 98.) Plaintiff did not respond to this comment, and did not immediately report any information about the rumor. (*See id.* at 99-100.) Plaintiff later reported the incident to Rogan. (*Id.*)

In a separate incident having nothing to do with the rumor, plaintiff contends that Barker and Maddox "talked about" her. (*See* Davidson Dep. at 114.) Specifically, plaintiff describes an incident in which Barker and Maddox were speaking to each other in plaintiff's presence. (*See id.*) Plaintiff claims that during their conversation, Maddox glanced at plaintiff, then turned and asked Barker if she knew a hit man's number. (*See id*.) Plaintiff did not respond or report this incident, and she stated that she believed this conversation stemmed from her co-worker's frustration with the fact that she was getting paid more. (*See id*. at 115.)

Plaintiff contends that during casual conversation many of her co-workers used curse words like "mother fucker, bitch, asshole, [and] asswipe," and that these words bothered her. (*See* Davidson Dep. at 70-74.) On one occasion, while plaintiff was Acting Supervisor, a co-worker named Amy Scott ("Scott"), a black female, cursed at plaintiff after plaintiff issued her a

---

[7] Plaintiff stated that she did not know the employees' names because they worked on another shift. (*See* Davidson Dep. at 99.)

9

written reprimand. (*See* Davidson Dep. at 73-74, 76-78.)  Plaintiff believes that Scott cursed her

because plaintiff issued the written reprimand. (*See id*.)  On another occasion, a co-worker

named "Rita"[8] cursed her. (*See id*. at 82-83.)  Plaintiff stated that she believes Rita cursed her

because Rita was "having a bad day." (*See id*. at 83.)  Finally, plaintiff alleges that a co-worker

named Ronnie Williams ("Williams"), a black male, cursed plaintiff once after plaintiff

accidently shut off his computer and again when plaintiff was late in preparing his taxes.[9] (*See*

*id*. at 103-109.)

Plaintiff acknowledged that she read and understood AmSouth's Non-Harassment Policy.

(*See* Davidson Dep. at 152-53 and Ex. 11.)  However, except for her complaint to Rogan in

approximately June of 1998, regarding the rumors and the "paper snatching" incident, plaintiff

never complained to any of her supervisors or higher levels of management about these

incidents. (Davidson Dep. at 100, 175-176.)

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any material fact

and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  The

party asking for summary judgment bears the initial burden of showing that no genuine issues

exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H.*

*Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met his burden, Rule 56(e)

requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue

for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).  A dispute is genuine "if the

---

[8]  Plaintiff could not remember Rita's last name. (*See* Davidson Dep. at 82.)

[9]  Plaintiff apparently prepared some of her co-worker's tax returns. (*See* Davidson Dep. at 104-106.)

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## III.   DISCUSSION

### A.   <u>Termination Claims</u>

The relative burdens of proof in Title VII and § 1981 disparate treatment claims are the same. *Brown v. American Honda Motor Co., Inc.*, 939 F.2d 946, 949 (11th Cir. 1991).  In any action alleging disparate treatment by an employer, the plaintiff must prove that the employer acted with a discriminatory motive. *See International Board of Teamsters v. United States,* 431 U.S. 324, 335 n.15 (1977). To establish a prima facie case of discrimination, a plaintiff may employ direct evidence of discriminatory intent, statistical proof of a pattern of discrimination, or circumstantial evidence. *See Verbraeken v. Westinghouse Elec. Corp.,* 881 F.2d 1041, 1045 (11th Cir. 1989). The evaluation of a plaintiff's evidence of the employer's intent differs, depending upon whether the plaintiff's proof is direct or circumstantial in nature.

In the present case, there is no direct evidence to support plaintiff's claims of discrimination. Thus, plaintiff must rely on circumstantial evidence to support her claims. Because plaintiff is relying on circumstantial evidence to support her claims, the court is

11

governed by the familiar, tripartite framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See Combs v. Plantation Patterns,* 106 F.3d 1519, 1527-28 (11th Cir. 1997) (clarifying the standard to be applied under Eleventh Circuit jurisprudence). Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *Burdine*, 450 U.S. at 252-53.[10] A plaintiff asserting a race or sex based discharge claim must show "(1) membership in a protected class[;] (2) qualification for the position held[;] (3) termination[;] (4) and replacement with a person outside the protected class." *Walker v. Nationsbank of Fla.*, 53 F.3d 1548, 1556 (11th Cir. 1995). Alternatively, a plaintiff may establish a prima facie case by showing that she was treated differently than a similarly situated employee outside the protected class. *Pearson v. Macon-Bibb County Hosp. Auth.*, 952 F.2d 1274, 1280 (11th Cir. 1992).

If the plaintiff successfully establishes a prima facie case, the burden of production shifts to the defendant "to articulate a legitimate, nondiscriminatory reason" for the employment action. *McDonnell Douglas*, 411 U.S. at 802. Defendant's burden to rebut the presumption created in such a situation is one of production rather than proof, requiring defendant to articulate a legitimate, nondiscriminatory reason for its action. *Burdine*, 450 U.S. at 257-58. In satisfying this burden:

---

[10]    "The facts necessarily will vary in Title VII cases, and the specification [] of the prima facie proof required from [plaintiff] is not necessarily applicable in every respect to differing factual situations." *McDonnell Douglas,* 411 U.S. at 802 n.13.

12

> [t]he employer's burden of rebuttal is "exceedingly light." Since the rebuttal
> burden is one of production only, the employer "need not persuade the court that
> it was actually motivated by the proffered reasons . . . . It is sufficient if the
> [employer's] evidence raises a genuine issue of fact as to whether it discriminated
> against the [employee]."

*Tipton v. Canadian Imperial Bank of Commerce,* 872 F.2d 1491, 1495 (11th Cir. 1989) (quoting

*Burdine,* 450 U.S. at 254-55) (alterations in original).

If the defendant succeeds in carrying this burden, then any "presumption of

discrimination created by the *McDonnell Douglas* framework drops from the case, and the

factual inquiry proceeds to a new level of specificity." *Combs,* 106 F.3d at 1528 (quotation

omitted). The plaintiff must then prove that the defendant's articulated reasons are a mere

pretext for unlawful motives (i.e., discrimination or retaliation). *Id.* A plaintiff's prima facie

case coupled with sufficient evidence to allow a fact finder to disbelieve the employer's

proffered explanation for its actions is enough to preclude entry of judgment as a matter of law.

*See id.* at 1529; *Benson v. Tocco, Inc.*, 113 F.3d 1203, 1207 (11th Cir. 1997). At all times, the

plaintiff bears the burden of persuasion on the ultimate question of whether the defendant acted

with an unlawful motive. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

To avoid summary judgment, a plaintiff must submit sufficient nonconclusory evidence

that defendant's articulated legitimate reasons for the employment decisions were pretextual.

*Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1471-72 (11th Cir. 1991); *Carter v. City of*

*Miami*, 870 F.2d 578, 585 (11th Cir. 1989). Plaintiff must put forth concrete evidence that casts

sufficient doubt on defendant's proffered reasons such that a reasonable fact finder would

conclude that those reasons did not actually motivate the employment decisions. *See Combs*,

106 F.3d at 1538; *Earley v. Champion Int'l. Corp.*, 907 F.2d 1077, 1083-84 (11th Cir. 1990).

13

Plaintiff alleges that "[o]n or about July 2, 1998, defendant fired plaintiff without good

cause, . . . [and a] motivating factor for the unlawful action . . . was intentional discrimination on

the basis of race and sex." (Complaint at ¶¶ 10-11.)  Specifically, plaintiff argues:

> AmSouth Bank fired Davida Davidson based upon a pretext. . . . Davidson shows
> that "failing to call in for three straight days to report her absence" is a recent
> semantic variation on the prior explanation for firing her.  It varies from the
> explanation given at the time by leaving out the phrase "job abandonment." . . .
> However, AmSouth chooses to phrase the violation, what is crucial is that
> "violation of the call-in policy" is not the true reason, because Davidson's
> conduct regarding the call-in policy was not in the least culpable.  If she was
> guilty, it was a hyper-technical offense which was not a rational basis for
> termination.

(Plaintiff's Brief in Opposition to Motion for Summary Judgment ("Pl.'s Br.") at 1-3.)

Defendant asserts:

> [P]laintiff missed work six (6) days without calling in to report that she would be
> absent.  Even if plaintiff erroneously thought that she did not have to call in for
> the remainder of the week of June 22-26 (although she admits she was never told
> that), she failed to call in three additional days the following week.  A direct
> violation of a company call-in policy constitutes a legitimate non-discriminatory
> reason to terminate an employee. . . . Plaintiff cannot demonstrate that the reason
> offered by defendant was a pretext for race or sex discrimination.

(Defendant's Brief in Support of Motion for Summary Judgment ("Def.'s Br.") at 16.)

Even assuming that plaintiff is able to prove a prima facie case,[11] AmSouth has offered a

legitimate, non-discriminatory reason for plaintiff's discharge: plaintiff missed work for three

consecutive days without calling in to report that she would be absent, in direct violation of

AmSouth's call-in policy.  (*See* Ramsey Aff. at ¶¶ 3, 7.)  Plaintiff missed work Wednesday, June

24, 1998; Thursday, June 25, 1998; and Friday, June 26, 1998, and did not call in to report that

she would be absent on any of these days.  (*See* Davidson Dep. at 162-63.)  On Saturday

---

[11] Defendant apparently does not dispute that plaintiff has established a prima facie case.
(*See* Def.'s Br. at 14-15.)

14

morning, June 27, 1998, Maddox e-mailed Ramsey in AmSouth's Corporate Human Resources Department to report plaintiff's absences. (*See* Giambrone Dep. Ex. 5; Ramsey Aff. at ¶ 3.) Ramsey recommended that plaintiff be terminated for job abandonment pursuant to AmSouth's call-in policy because she was absent for three consecutive days. (*See* Giambrone Dep. Ex. 6; Ramsey Aff. at ¶¶ 3, 5.)

Moreover, not only did plaintiff fail to call in for the three days discussed above, plaintiff failed to call in Monday, June 29, 1998; Tuesday, June 30, 1998; and Wednesday, July 1, 1998. (*See* Davidson Dep. at 163, 166.) In her deposition, when asked why she didn't call in on July 1, 1998, plaintiff responded that she "just didn't." (*See id*. at 168.) When plaintiff finally called in on July 2, 1998, she was informed for the first time that she had been terminated. (*See id.* at 167.) Because of AmSouth's call-in policy, and because she was not aware of her termination until July 2, 1998, plaintiff should have been calling to report her absence each day she thought that she was supposed to work. In total, plaintiff missed six days of work without calling in to report that she would be absent. (Davidson Dep. at 162-63, 166.) Even if plaintiff erroneously believed that she did not have to call in for the remainder of the week of June 22-26, 1998,[12] she failed to call in three additional days the following week.[13] (*Id.* at 163, 166.)

A direct violation of a company call-in policy constitutes a legitimate non-discriminatory reason to terminate an employee. *See Crews v. First Correction Corp.*, 94 F. Supp. 2d 1277, 1289 (S.D. Ala. 2000). Plaintiff has failed to demonstrate that the reason offered by defendant

---

[12]  Plaintiff admitted that she was never told that she did not have to call in for the remainder of the week of June 22-26, 1998. (Davidson Dep. at 161-62.)

[13]  In addition, if plaintiff realistically believed that she was not required to call in daily for the week of June 22-26, 1998, it is at the very least curious that plaintiff never contacted Ramsey with questions regarding her termination. (*See* Ramsey Aff. at ¶ 4.)

15

was a pretext for race or sex discrimination. The evidence before the court is that AmSouth applied this policy uniformly to all of its employees without regard to their race or sex. (*See* Ramsey Aff. at ¶¶ 5-7.) Plaintiff has put forth no evidence establishing that white or male employees were allowed to remain employed after missing work for three straight days without calling in. Plaintiff's contention that Ingle and Barker remained employed after violating the policy are conclusory and unsupported by any evidence. When plaintiff was asked whether she knew whether Ingle called in to a supervisor, plaintiff responded, "I think Kenneth mentioned that he didn't call in." (Davidson Dep. at 180.) This response indicates plaintiff's lack of personal knowledge regarding whether Ingle properly reported his absence. Further, Ingle's attendance record contains no notations that Ingle ever failed to report his absences. (Ramsey Aff. at ¶ 7 and Ex. F.) Moreover, plaintiff testified that she did not know whether Barker called in or not. (*See* Davidson Dep. at 181.) In her deposition testimony, Barker acknowledged that she was absent for three straight days, but stated that she called in daily because "[t]hat's policy." (*See* Barker Dep. at 35.) Maddox, Barker's supervisor, also testified that Barker called in to report her absences. (*See* Maddox Dep. at 32.)

Plaintiff has submitted no evidence demonstrating that AmSouth's articulated reason for terminating plaintiff's employment is pretextual. Plaintiff was terminated for failing to report that she would be absent on June 24, 25, and 26, 1998. (Ramsey Aff. Ex. E.) Plaintiff admits in her deposition that she did not call in to report that she would be absent. (Davidson Dep. at 162-63, 166.) The court finds no merit in plaintiff's argument that AmSouth changed the stated reason for the termination. Plaintiff attempts to point to "semantic variations" in the reason given for plaintiff's discharge, apparently claiming pretext on the basis that sometimes the phrase "job abandonment" was or was not included along with the explanation that plaintiff had

16

... 

missed work for three consecutive days without calling in to report that she would be absent. (*See* Pl.'s Br. at 1-9.) Such action is considered to be job abandonment. (*See* Ramsey Aff. Ex. E.) However, whether the words "job abandonment" were or were not used is irrelevant. The reason for plaintiff's termination--missing work for three consecutive days without calling in to report that she would be absent--has never changed, from the first response to the EEOC throughout this litigation.

Additionally, plaintiff's argument that the policy in issue "was a hyper-technical offense which was not a rational basis for termination," (*see* Pl.'s Br. at 3), is without merit. A court does "not sit as a super-personnel department that reexamines an entity's business decisions." *Alpin v. Sears, Roebuck & Company*, 940 F.2d 1497, 1501 (11th Cir. 1991), quoting *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986). Courts "are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999).

Plaintiff has failed to raise a genuine issue of material fact that defendant's articulated reason is a mere pretext for unlawful motives. Plaintiff has offered no evidence to refute defendant's assertion that she violated the call-in policy. Plaintiff has offered nothing more than her own conlcusory allegations of discrimination. Such conclusory allegations, without more, are insufficient to raise an inference of pretext or intentional discrimination. *See Isenbergh v. Knight-Ridder Newspaper Sales, Inc.,* 97 F.3d 436, 444 (11th Cir. 1996); *Coutu v. Martin County Bd. of County Comm'rs.,* 47 F.3d 1068, 1074 (11th Cir. 1995); *Young v. General Foods Corp.,* 840 F.2d 825, 830 (11th Cir. 1988). Further, an "employee's mere suspicion of [race] discrimination, unsupported by personal knowledge of discrimination, will not constitute

17

pretext." *Sturniolo v. Sheaffer, Eaton, Inc.,* 15 F.3d 1023, 1026 (11th Cir. 1994). Thus, defendant is entitled to judgment as a matter of law on plaintiff's discharge claims.

**B.    Retaliation Claim for alleged complaints of sex discrimination**

           *1.    Dismissal*

Plaintiff further claims that AmSouth retaliated against her by discharging her for complaining of sex discrimination. (*See* Compl. at ¶ 12.) As an initial matter, because plaintiff's only claim of retaliation is based on her alleged complaints of sex discrimination plaintiff has no § 1981 retaliation claim, as § 1981 applies only to race discrimination. *See Bobo v. ITT, Continental Baking Co.*, 662 F.2d 340, 342 (5th Cir. 1981) (holding that § 1981 does not encompass sex discrimination claims).

Moreover, plaintiff's Title VII retaliation claim must be dismissed because she failed to assert this claim in her EEOC charge. Although the Eleventh Circuit has adopted an exception to the charge-filing requirement when the alleged retaliatory conduct occurred after the charge was filed, *see Hargett v. Valley Federal Sav. Bank*, 60 F.3d 754, 761-62 (11th Cir. 1995), when all of the alleged retaliatory acts occurred before the filing of the charge, the retaliation claim must be included in the charge. *See Ullmann v. Ohio Bureau of Empl. Servs.*, 201 F.3d 441, 1999 WL 32226, at *12 (6th Cir. Dec. 3, 1999) (unpublished decision).

           *2.    Prima Facie Case*

Even if plaintiff had properly asserted a Title VII retaliation claim, such claim fails because she has failed to establish a prima facie case. In analyzing plaintiff's retaliation claim, the court is again governed by the familiar, tripartite framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See Combs v. Plantation Patterns,*

18

106 F.3d 1519, 1527-28 (11th Cir. 1997) (clarifying the standard to be applied under Eleventh Circuit jurisprudence).[14]  A plaintiff alleging retaliation must first establish a prima facie case by demonstrating "(1) that she engaged in statutorily protected activity, (2) that an adverse employment action occurred, and (3) that the adverse action was causally related to the plaintiff's protected activities." *Coutu v. Martin County Bd. Of County Comm'rs,* 47 F.3d 1068, 1074 (11th Cir. 1995); *Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385, 1388 (11th Cir. 1998).

Plaintiff has offered no evidence that she complained about sex discrimination while employed at AmSouth and, therefore, plaintiff has failed to establish that she engaged in "protected activity" under Title VII.  In addition, plaintiff's retaliation claim fails because plaintiff cannot demonstrate any causal relationship between any complaint made by plaintiff and her termination.  Furthermore, plaintiff cannot demonstrate that defendant's legitimate, nondiscriminatory reason for discharging her was a pretext for unlawful retaliation.

Title VII only protects complaints of conduct which is unlawful under the Act.  *See* 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made unlawful by [42 U.S.C. § 2000e], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.").  The only complaint plaintiff made to AmSouth while she was employed was to Rogan, the Corporate Manager of Employee Relations at the time, regarding the rumor that she was sexually involved with members of the cleaning service and the paper snatching

---

[14]  This framework is set out in part III. A of this memorandum opinion.

incident. (*See* Davidson Dep. at 100, 123.) At the time of the complaint, plaintiff stated that she did not know why the incidents were happening. (*See id*. at 123.) At no time did plaintiff ever complain that she was being discriminated against on the basis of her *sex*. As discussed above, Title VII protects employees only from retaliation premised on opposition to employment practices which are unlawful under Title VII. 42 U.S.C. § 2000e-3(a). General "harassment" is not an unlawful activity under Title VII. *Mobley v. Dillon Cos., Inc.*, 153 F.3d 727, 1998 WL 314589, at *7 (10th Cir. May 29, 1998) ("General harassment if not racial or sexual is not actionable. . . . Further, a plaintiff must show more than a few isolated incidents of racial enmity.") (internal quotations and citations omitted) (unpublished decision). In short, if plaintiff did not complain about sex discrimination while employed at AmSouth, she could not have been retaliated against for having done so.

Alternatively, even assuming that plaintiff honestly believed that defendant's actions were a result of sex-based prejudice at the time she complained to Rogan, there is no evidence whatsoever that Ramsey, Maddox, or Giambrone, the only people involved in the decision to terminate plaintiff, were aware that plaintiff had ever made any complaints at AmSouth. To the contrary, the only evidence is that neither Maddox, Giambrone, nor Ramsey were aware that plaintiff contacted anyone at AmSouth regarding any complaints that she had. (*See* Maddox Dep. at 36; Giambrone Dep. at 34; Ramsey Aff. at ¶ 8.) To establish the required "causal connection" between protected activity and a subsequent adverse employment action, plaintiff must demonstrate at a minimum that defendant was aware of the protected activity at the time she was terminated. *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993). The Eleventh Circuit requires "plaintiffs to show a defendant's awareness with more evidence than mere curious timing coupled with speculative theories." *Raney v. Vinson Guard Serv.*, 120 F.3d

20

1192, 1197 (11th Cir. 1997). Even if plaintiff complained about sex discrimination when she
met with Rogan, there is no evidence that either Ramsey, Maddox, or Giambrone knew of
plaintiff's complaints. Accordingly, plaintiff has failed to establish a causal connection between
her complaint and her termination, and, therefore, cannot establish a prima facie case.

### 3. Pretext

Even if plaintiff had established a prima facie case of retaliation, defendant has
articulated a legitimate, non-discriminatory reason for plaintiff's termination - her failing to call
in for three straight days to report her absence. (*See* Ramsey Aff. at ¶¶ 3, 7.) Plaintiff admitted
that she was advised, and her discharge paperwork reflects, that she was being discharged for
missing work for three straight days without calling to report her absence. (*See* Davidson Dep.
at 153; Ramsey Aff. Ex. E.) As previously addressed, failing to call in for three straight days is
in direct violation of AmSouth's call-in policy. Plaintiff read and understood AmSouth's policy.
(*See* Davidson Dep. at 152-53 and Ex. 11.) Plaintiff has failed to offer evidence on which a
reasonable jury could conclude that defendant's proferred reason for discharging her was pretext
for unlawful retaliation. Thus, defendant is entitled to judgment as a matter of law on plaintiff's
claim of retaliation for alleged complaints of sex discrimination.

### C.    Plaintiff's Retaliation Claim for alleged complaints of race discrimination

Plaintiff attempts to assert an entirely new claim -- retaliation on the basis of complaining
of racial harassment. (*See* Pl.'s Br. at 13-15.) For the reasons set forth in the Order denying
Plaintiff's Motion to Amend the Complaint, plaintiff is not allowed to now assert this new claim.

However, even assuming that plaintiff had properly asserted a claim of retaliation based
on complaints of race discrimination, such claim would also warrant dismissal. There is no
evidence that plaintiff ever complained that she was being discriminated against on the basis of

21

her race. When plaintiff was asked at her deposition about the meeting with Rogan, she testified that Rogan asked her whether she thought "these things are happening to [her] because [she is] black," to which plaintiff responded, "I [don't] know, that's why I [am] here to talk to [you]." (*See* Davidson Dep. at 123.) Plaintiff did not remember anything else that was said. (*Id.* at 123-24.) In the face of her previous, unequivocal testimony, plaintiff seeks to alter that testimony and alleges that she told Rogan that she did not know if race was the only reason for her treatment. (*See* Affidavit of Davida Dionne Davidson ("Davidson Aff.") at ¶¶ 9-11.) Plaintiff's Affidavit testimony on this matter is disregarded as a sham. *See Bank of Illinois v. Shepard*, 75 F.3d 1162, 1169-71 (7th Cir. 1996) (holding that neither a party nor a witness can create or negate existence of genuine issue of material fact by offering testimony, by deposition or affidavit, that contradicts without explanation prior sworn testimony); *accord Sullivan v. Conway*, 157 F.3d 1092, 1097 (7th Cir. 1998) ("having given his sworn [testimony], the witness who later thinks better of what he said is not entitled to have his oral retraction believed merely because it too is under oath") (citing *Pyramid Securities Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1124 (D.C. Cir. 1991)); *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact that party cannot thereafter create such an issue with an affidavit that merely contradicts without explanation, previously given clear testimony.").

Moreover, even assuming that plaintiff honestly believed that defendant's actions were a result of race-based prejudice at the time she complained to Rogan, there is no evidence whatsoever that Ramsey, Maddox, or Giambrone, the only people involved in the decision to terminate plaintiff, were aware that plaintiff had ever made any complaints at AmSouth. To the

contrary, the only evidence is that neither Maddox, Giambrone, nor Ramsey were aware that plaintiff contacted anyone at AmSouth regarding any complaints that she had. (*See* Maddox Dep. at 36; Giambrone Dep. at 34; Ramsey Aff. at ¶ 8.)[15]

To establish the required "causal connection" between protected activity and a subsequent adverse employment action, plaintiff must demonstrate at a minimum that defendant was aware of the protected activity at the time she was terminated. *See Goldsmith*, 996 F.2d at 1163. The Eleventh Circuit requires "plaintiffs to show a defendant's awareness with more evidence than mere curious timing coupled with speculative theories." *Raney*, 120 F.3d at 1197. Even if plaintiff complained about race discrimination when she met with Rogan, there is no evidence that either Ramsey, Maddox, or Giambrone knew of plaintiff's complaints. Therefore, plaintiff has failed to demonstrate a causal connection between her complaint and her termination. Thus, her prima facie case fails.

In addition, defendant has articulated a legitimate, non-discriminatory reason for plaintiff's discharge: plaintiff failed to call in for three straight days to report her absence. (Ramsey Aff. at ¶¶ 3, 7.) Plaintiff has offered no evidence establishing that defendant's proferred reason is pretextual. As previously addressed, failing to call in for three straight days is in direct violation of AmSouth's call-in policy. (*See* Davidson Dep. at Ex. 8.) Plaintiff read and understood AmSouth's policy. (*See* Davidson Dep. at 152-53 and Ex. 11.) Plaintiff has not offered evidence on which a reasonable jury could conclude that defendant's proferred reason

---

[15] Plaintiff asserts that there is "reasonable inference" that Maddox and Giambrone were aware of plaintiff's complaint to Rogan. (Pl.'s Br. at 14.) However, plaintiff has provided no *evidence* to support such an inference. Plaintiff has submitted no evidence that contradicts the testimony of Maddox and Giambrone that they had no knowledge that plaintiff had even talked to Rogan, much less that she made any complaints based on race.

23

for discharging her was pretext for unlawful retaliation.  Thus, defendant would be entitled to judgment as a matter of law on plaintiff's claim of retaliation for alleged complaints of race discrimination.

## D.    Disparate Terms and Conditions of Employment

Plaintiff claims that she was subjected to disadvantageous terms and conditions of employment on the basis of race and sex.  (Compl. at ¶ 8.)  However, plaintiff apparently concedes this claim in her brief.  (Pl.'s Br. at 15) ("Davidson does not pursue a separate remedy for unlawful terms and conditions of employment.  In all other respects, the Motion for Summary Judgment should be denied as to Davidson's claims of unlawful discharge with leave for Davidson to amend the complaint . . . .")  Even if plaintiff does not concede this claim, however, defendant would still be entitled to judgment as a matter of law inasmuch as such claim is time-barred under Title VII and such incidents do not constitute an actionable claim under § 1981.

### 1.    Title VII Claims are Time Barred

A plaintiff must file a Title VII discrimination charge with the EEOC within 180 days of the alleged violation.  42 U.S.C. § 2000e-5(e); *see also Quillen v. American Tobacco Co.*, 874 F. Supp. 1285, 1292 (M.D. Ala. 1995).  "Failure to file before this time elapses requires the court to dismiss a subsequent lawsuit as untimely." *Quillen*, 874 F. Supp. at 1292.  Thus, a prerequisite to maintaining a Title VII action is the timely filing of a charge with the EEOC.  *United Airlines, Inc. v. Evans*, 431 U.S. 553, 555 n.4 (1977); *Mitchell v. Jefferson County Bd. of Educ.*, 936 F.2d 539, 543 (11th Cir. 1991).  The 180-day charge filing period contained in Title VII reflects a preference for the administrative resolution of claims and the "Congressional purpose to achieve remediation primarily by conciliation." *Welty v. S.F. & G., Inc.*, 605 F. Supp. 1548, 1553 (N.D.

24

Ala. 1985). While the requirement that an EEOC charge be timely filed is not jurisdictional in nature, *see Zipes v. Trans World Airlines*, 455 U.S. 385, 393 (1982), the requirement is a condition precedent to the maintenance of an action, and the plaintiff bears the burden of demonstrating that the conditions precedent have been satisfied. *Jackson v. Seaboard Coast Line Railroad*, 678 F.2d 992, 1010 (11th Cir. 1982). Plaintiff filed her EEOC Charge on December 18, 1998. (*See* Davidson Dep. at Ex. 5.) Thus, any claims arising out of events which occurred prior to June 21, 1998, are time barred because plaintiff failed to file a timely charge with the EEOC.

Plaintiff's complaint alleges that during her employment defendant subjected her to terms and conditions of employment which were disadvantageous compared to the favorable terms and conditions of employment provided to similarly situated white and male employees. (*See* Compl. at ¶ 8.) However, the last day that plaintiff was actually present and working at AmSouth was June 19, 1998. (*See* Davidson Dep. at 155.) Therefore, all of the events which could possibly serve as the basis for this claim would have occurred before June 19, 1998.

Plaintiff's EEOC charge was not filed until December 18, 1998. (*See* Davidson Dep. at Ex. 5.) In order to satisfy the 180-day filing pre-requisite, the events giving rise to plaintiff's claims must have occurred between June 21, 1998, and December 18, 1998. Plaintiff was not even present at the AmSouth facility after June 19, 1998. Therefore, plaintiff cannot possibly present evidence to support any claims that she was subjected to disparate terms and conditions of employment. Thus, all of plaintiff's Title VII claims, except her termination and retaliation claims, are due to be dismissed as untimely.[16]

---

[16] The termination and retaliation claims are dismissed for the reasons discussed *supra*.

25

### 2.    § 1981 Claims

The only events plaintiff described which could even potentially support her claim that she was subjected to race-based[17] disparate treatment and conditions of employment are the following incidents:  (1) the KKK comment by her co-worker; (2) the incident involving the wet food; (3) the rumors regarding her sexual involvement with the janitorial staff; (4) the comment about the hit man; (5) the paper snatching incident; and (6) the cursing.[18]

With regard to these claims, plaintiff cannot show that any of these incidents adversely affected the terms and conditions of her employment.  Further, even assuming that any of these alleged incidents constitute an actionable claim under § 1981, plaintiff has failed to make the most basic showing of proof that such actions had anything to do with her race.  Plaintiff's unsubstantiated hearsay and conjecture do not amount to substantial evidence sufficient to survive defendant's motion for summary judgment.  Because plaintiff has not put forth any evidence, much less established that any of the alleged events occurred because of her race, AmSouth is entitled to summary judgment as to plaintiff's claim that she was subjected to disparate terms and conditions of employment.  An "employee's mere suspicion of [race] discrimination, unsupported by personal knowledge of discrimination," is insufficient.  *Sturniolo v. Sheaffer, Eaton, Inc.*, 15 F.3d 1023, 1026 (11th Cir. 1994).  "Inferences and opinions must be grounded on more than flights of fancy, speculations, hunches, intuition or rumors;

---

[17]  Section 1981 applies only to race discrimination.  *See Bobo*, 662 F.2d at 342 (holding that § 1981 does not encompass sex discrimination claims).

[18]  Despite acknowledging that she read and understood AmSouth's Non-Harassment Policy, (*see* Davidson Dep. at 152-53 and Ex. 11), with the exception of complaining to Rogan in approximately June of 1998, regarding the rumors and the "paper snatching" incident, plaintiff never complained to any of her supervisors or higher levels of management about these incidents,  (*id*. at 100, 175-176, and Ex. 11).

26

discrimination law would be unmanageable if disgruntled employees could defeat summary judgment by speculating about the defendant's motives." *Lewis-Webb v. Qualico Steel Co.*, 929 F. Supp. 385, 392 (M.D. Ala. 1996) (quoting *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1146 (7th Cir. 1994)).

## CONCLUSION

For the foregoing reasons, the court is of the opinion that defendant AmSouth Bank is entitled to judgment as a matter of law. An order granting Defendant AmSouth Bank's Motion for Summary Judgment will be entered contemporaneously with this Memorandum Opinion.

**DONE** this **13th** day of December, 2000.

Sharon Lovelace Blackburn

**SHARON LOVELACE BLACKBURN**
United States District Judge

27